NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 19CVS 723

---

SHANNON GONZALEZ and
BRONAL GARY, *individually and on behalf
of persons similarly situated*,

Plaintiff,

*v.*

INBOX LOAN, KASHIA BAND OF POMO
INDIANS OF THE STEWARTS POINT
RANCHERIA, and TRUEACCORD CORP.,

Defendants.

CLASS ACTION COMPLAINT
(Jury Trial Demanded)

---

## I. INTRODUCTION

1.    Shannon Gonzalez and Bronal Gary ("Plaintiffs") bring this lawsuit on behalf of a class of North Carolinians who fell victim to Defendants' predatory lending business model: offering and entering into "payday loans"[1] at usurious interest rates repugnant to North Carolina law. Defendants' illegal loan practices have saddled North Carolina residents with oppressive repayment requirements, harassing collection tactics, and reports of non-payment to credit agencies, while Defendants profit at their expense.

2.    Central to this action is the online payday lending industry at large, which takes advantage of desperate Americans needing quick access to money by charging unconscionably high

---

[1] The term "payday loan" refers to "small, high-interest, short-term cash loans." *E.g.*, *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 710 n.2 (4th Cir. 2015). Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and the Class may be more accurately defined as installment loans. As expounded *infra* Footnote 4: regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to loans of $25,000 or less made to North Carolina borrowers at interest rates that exceed an annual percentage rate ("APR") of 16 percent. N.C. Gen. Stat. § 24-1.1.

interest rates, in Ms. Gonzalez's case, a staggering 773.91% APR, and in Mr. Gary's case, a staggering 780% APR. The usury statutes in North Carolina, similar to statutes across the country, are "designed to protect the borrower whose necessity and importunity may place him [or her] at a disadvantage with respect to the exactions of the lender."[2]

3.      Payday lenders, such as Defendant Inbox Loan, act as though they are above the law by associating with a Native American tribe, such as Defendant Kashia Band of Pomo Indians of the Stewarts Point Rancheria ("Kashia Band"), claiming complete sovereign immunity, while third party debt collectors, such as Defendant TrueAccord Corp. ("TrueAccord"), collect on the illegal debts not owed through incessant, improper collection efforts on their behalf.

4.      But Defendants cannot evade the lending laws asserted in this case. Defendants solicited and engaged in substantial business in North Carolina with its citizens, including Plaintiffs, and the proposed Class, through usurious, illegal online lending practices.

5.      Plaintiffs and the proposed Class seek relief for violations of the North Carolina Consumer Finance Act, North Carolina usury laws, Unfair and Deceptive Practices Act, state and federal debt and agency collection laws, the federal Truth in Lending Act, and unjust enrichment.

## II.      JURISDICTION AND VENUE

6.      This Court has original jurisdiction over this action under N.C. Gen. Stat. § 7A-240.

7.      This Court has personal jurisdiction under N.C. Gen. Stat. § 1-75.4 because Inbox Loan and the Kashia Band solicit and enter into loan contracts in the State, which TrueAccord attempts to collect and collects on in the State. Defendants cause injury in the State, including collecting usurious interest rates and engaging in improper debt collection practices.. Plaintiffs reside in the State, and Defendants directed their payday loan scheme and collection efforts to Plaintiffs

---

[2] *State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630, 633–34, 624 S.E.2d 371, 374–75 (2005) (citing *Mortgage Co. v. Zion Church*, 219 N.C. 395, 397, 14 S.E.2d 37, 38 (1941)).

and class members residing in this State. .

8. Venue is appropriate in this county because Plaintiffs reside here, their Inbox Loan agreement were formed here, Defendants do business here, and Plaintiffs suffered harm here based on Inbox Loan's tortious conduct.

### III. PARTIES

9. Plaintiff Shannon Gonzalez is a natural person and resident of Davidson County, North Carolina.

10. Plaintiff Bronal Gary is a natural person and resifent of Forsyth County, North Carolina.

11. Defendant Inbox Loan is an online lending company that offers payday loans and similar loan arrangements at usurious interest rates to consumers in North Carolina and across the country. Inbox Loan lists its location on its website as PO Box 881, Santa Rosa, CA 95402, and purports to be a "wholly-owned subsidiary of Kashia Services, a wholly owned business entity of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria," located in the United States as a "sovereign nation." Exhibit A , Gonzalez Loan Agreement at 3; Exhibit B, Gary Loan Agreement at 4; https://www.inboxloan.com/ (last visited 11/29/18).

12. Defendant Kashia Band of Pomo Indians of the Stewarts Point Rancheria is a federally recognized Native American Tribe, with its administrative office at 1420 Guerneville Rd., Suite 1, P.O. Box 6525, Santa Rosa, CA 95403. It purportedly operates and controls Inbox Loan, which it ostensibly created as a business entity pursuant to its internal Tribal ordinances to engage in lending "for the benefit of the" Kashia Band. *See* Exhibit C, Kashia Band Lending Business Ordinance #13; Exhibit D, Kashia Band Lending Regulatory Ordinance #12.

13. Defendant TrueAccord Corp. is a third party debt collector paid to collect the unlawful loans described in this Complaint on behalf of Inbox Loan and the Kashia Band, which it

3

does by contacting the purported debtors directly, including Plaintiff. It is a Delaware corporation, with a principal place of business at 303 Second Street, Suite 750 South, San Francisco, CA 94107.

IV.    FACTS PERTINENT TO SHANNON GONZALEZ

14.    On December 30, 2017, Shannon Gonzalez completed an online application form from her home in Davidson County, North Carolina to see whether she was eligible for a personal loan needed for an upcoming trip.

15.    In the application, she offered basic information, such as her name, social security number, income, bank account number, and the loan amount she was seeking. Ms. Gonzalez selected the $100 to $500 loan option.

16.    Moments after the submission, the online results revealed that Inbox Loan had approved her loan, and an Inbox Loan representative called and left her a voicemail that she had been approved.

17.    Ms. Gonzalez returned Inbox Loan's call and briefly spoke to a representative who confirmed her loan approval, and while remaining on the line, transmitted an email to her where she could access the Inbox Loan contract.

18.    When Ms. Gonzalez opened the message from Inbox Loan, she noticed that her signature was already populated electronically on the contract. Thus, Inbox Loan recorded Ms. Gonzalez's assent to the contract's terms before she even had an opportunity to review the contract.

19.    Those contract terms listed a $300.00 loan from Inbox Loan, to be repaid weekly over a one-year term, at an annual percentage rate of 773.91%. Exhibit A, Gonzalez Loan Agreement.

20.    In all, Ms. Gonzalez would be required under the contract to pay $2,356.62 in principal and interest for the $300.00 loan. *Id.*

21.    After reviewing the conract for the first time, Ms. Gonzalez learned of the usurious

4

interest rate and repayment amount of close to seven times the principal, and informed the Inbox Loan representative, who was still on the call, that she would not agree to the terms.

22.     In response, the Inbox Loan representative, who had offered little to no explanation of the terms of the contract, insisted that it was too late and that the payment was already processing electronically at her bank, Wells Fargo.

23.     Ms. Gonzalez hung up in disagreement and contacted Wells Fargo to inform it of Inbox Loan's conduct and attempt to deduct payment from her bank account.

24.     Ms. Gonzalez was forced to pay Wells Fargo a $30.00 stop payment fee to prevent Inbox Loan from deducting payments from her bank account.

25.     Ms. Gonzalez received a bank deposit of $300 due to her purported Inbox Loan contract.

26.     Ms. Gonzalez has paid back the principal amount of her loan.

27.     The debt collector TrueAccord Corp continues to contact Ms. Gonzalez about three times per week to make payments associated with her purported contract with Inbox Loan, typically by email or phone.

28.     For example, on August 25, 2018, TrueAccord representative Daryl Washington wrote Ms. Gonzalez to "resolve" her "outstanding balance" with Inbox Loan, and again on September 18, 2018, to "Keep moving forward" on her "balance . . . with Inbox Loan."

V.     FACTS PERTINENT TO BRONAL GARY

29.     On August 29, 2018, Bronal Gary completed an online application form from his home in Forsyth County, North Carolina to see whether he was eligible for a personal loan.

30.     In the application, he offered basic information, such as his name, social security number, income, bank account number, and the loan amount he was seeking. Mr. Gary selected the $825.00 loan option.

5

31.     Moments after the submission, the online results revealed that Inbox Loan had approved his loan for $825.00, and an Inbox Loan representative called him to let him know that he had been approved.

32.     Mr. Gary briefly spoke to a representative who confirmed his loan approval, and while remaining on the line, transmitted an email to him where he could access the Inbox Loan contract.

33.     When Mr. Gary opened the message from Inbox Loan, he noticed that his signature was already populated electronically on the contract. Thus, Inbox Loan recorded Mr. Gary's assent to the contract's terms before he even had an opportunity to review the contract.

34.     Those contract terms listed a $825.00 loan from Inbox Loan, to be repaid weekly over a one-year term, at an annual percentage rate of 780%. Exhibit B, Gary Loan Agreement.

35.     In all, Mr. Gary would be required under the contract to pay $6,352.67 in principal and interest for the $825.00 loan. *Id.*

36.     Mr. Gary paid the loan back every week, and to date, has paid over $1,150.00 over the past four months.

## VI.     CLASS ALLEGATIONS

### A. Overview of Defendants' Unlawful Lending Enterprise

37.     The Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "Kashia Band") is a federally recognized Native American tribe located in Sonoma County of California. http://stewartspoint.org/wp/ (last visited 10/26/18).

38.     The Kashia Band, through its "General Council," established a "tribal business entity" called "Kashia Services," which it "authorized to do business on behalf of the Tribe" to "operate and manage one or more consumer lending businesses on behalf of and for the benefit of the Tribe. The Tribe shall have and maintain sole proprietary interest and responsibility for Kashia

6

Services and its business operations." Exhibit C, Kashia Band Lending Business Ordinance #13.

39.     The Kashia Band authorized Kashia Services to operate the consumer lending businesses and "establish such subsidiaries or otherwise operate under such business name(s) as it deems appropriate," providing that it implement its authority and control in a variety of ways, including, *e.g.*: operate the "consumer lending business(es) in compliance with Tribal and other applicable law," manage business accounts and revenue, "acquire, hold, manage and dispose of assets," "retain staff," "contract" with others, "borrow money and incur financial obligations," and "sue, and to the extent of any valid waiver of its sovereign immunity, be sued in any court of competent jurisdiction," among other things. *Id.*

40.     The Kashia Band created another business entity, "Kashia Lending Enterprise," which it established under prior Lending Ordinance No. 12, now a "subsidiary of Kashia Services" through Lending Ordinance No. 13, to be managed by the governing body of Kashia Services in accordance with the Tribal Ordinance "and other applicable law." Exhibit C, Kashia Band Lending Business Ordinance #13; Exhibit D, Kashia Band Lending Regulatory Ordinance #12.

41.     The Kashia Band created a "Board" to be "responsible for overseeing the operation and management of Kashia Services and its subsidiaries," among other things. Exhibit C, Kashia Band Lending Business Ordinance #13.

42.     The Kashia Band's general policy and intent was to "exercise its sovereignty and powers of self-government by establishing and operating Tribal businesses for the benefit of the Tribe and its members and in compliance with Tribal and other applicable laws." *Id.*

43.     The Kashia Band Lending Regulatory Ordinance #12 provided that licensees "are required to ensure that every consumer loan transaction, and all other aspects of their business operations, comply with applicable provisions of the federal Truth in Lending Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, IRS reporting requirements, and any other laws

7

that are or may become applicable to the lending business." Exhibit D, Kashia Band Lending Regulatory Ordinance #12 at 9.

44.    The Kashia Band Lending Business Ordinance #13 provided that its Board must "ensure business operations (including those undertaken by contracted service providers) comply with applicable law and contract requirements, and that Kashia Services, each of its subsidiaries, and all service providers maintain valid Kashia Lending Commission licenses to the extent required by the Kashia Lending Regulatory Ordinance." Exhibit C, Kashia Band Lending Business Ordinance #13 at 6.

45.    Inbox Loan, an online lending company that offers payday loans and similar loan arrangements at usurious interest rates throughout North Carolina and across the country, was created under these Kashia Band ordinances.

46.    Inbox Loan is a "wholly-owned subsidiary of Kashia Services, a wholly owned business entity of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria," located in the United States as a "sovereign nation." Exhibit A, Gonzalez Loan Agreement at 3; Exhibit B, Gary Loan Agreement at 4; https://www.inboxloan.com/ (last visited 1/11/19).

47.    TrueAccord is paid to collect the unlawful loans described in this Complaint on behalf of Defendants, which it does through incessant and harassing contacts with the purported debtors.

48.    According to Inbox Loan's homepage, it "abides by all applicable federal laws and regulations as established by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria." *Id.*

## B.  Defendants' Claims Of Sovereign Immunity Will Not Bear Scrutiny

49.    In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws, the most recent being the "rent-a-tribe" scheme.

8

50.     In a rent-a-tribe scheme, a payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.

51.     In recent years, these rent-a-tribe schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending laws.[3]

52.     Here, although the Kashia Band claims that it "wholly owns" the lending business, on information and belief the tribe does not truly control or operate the business.

53.     An examination of the Tribe's lending operations indicates that it does not have the capital, technological sophistication, managerial expertise or financial sophistication to operate the business without undisclosed, non-tribal business partners.

54.     The tribe's publicly available documents  provide scant details about the operation of the lending business. None establish the tribe's active involvement in the management of the lending operation.

55.     There are no publicly available documents describing the business partners or vendors necessary to operate an online payday lending business, including but not limited to:

(a)     sources of the capital for the loans;

(b)     providers of information technology services that support the online lending operation;

(c)     staffing and training support for call centers; and

(d)     Automated Clearing House ("ACH") expertise and financial operators facilitating the

---

[3] *See* www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

9

deferred deposits by which the loans are paid.

56.    There does not appear to be any tribal council or committee votes on the lending website or business, lists of tribal employees of the business in tribal directories, nor references to the revenue or losses the tribal business was incurring for the tribe itself.

57.    Based on the above investigation, Plaintiffs make the following allegations on information and belief:

    (a)    the primary lending and collection operations of Inbox Loan are not operated on tribal land or on tribal property. For example, payments on the loans are collected by True Accord and outside of tribal lands;

    (b)    the Tribe has little or no control over how the loans are financed or underwritten;

    (c)    an undisclosed entity provides the underwriting services for the loans in the form of the software provided for analyzing the online loan applications and the automatic population of terms "acceptance" described by Plainbtiffs in paragraphs 15-16 and 30-31; and

    (d)    the Tribe shares the profits from the loans with an undisclosed, non-tribal entity.

## C. Defendants' Lending Practices Violate North Carolina Laws

58.    At the time that Inbox Loan made its purported loan to Plaintiffs and the Class, Defendants were aware that North Carolina law prohibits unlicensed lenders from making loans of $25,000 or less, at interest rates exceeding 16 percent per annum, and prohibits licensed lenders with the Commissioner of Banks from making consumer loans up to $15,000 at 30 percent per annum. N.C. Gen. Stat. §§ 24-1.1, 53-176.

59.    These consumer loan interest statutes were enacted in North Carolina as a matter of

10

"paramount public policy" to "protect North Carolina resident borrowers." N.C. Gen. Stat. § 24-2.1.

60. At the time that Inbox Loan made its loans to Plaintiffs and the Class, Defendants were aware that any loan made to North Carolina borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest or any charges whatsoever with respect to the loan. N.C. Gen. Stat. §§ 53-166(a) and (d), 53-168(a), 53-176.

61. Upon information and belief, Defendants have never applied to the Commissioner of Banks for a license permitting them to make loans to North Carolina borrowers, such as Plaintiffs and the Class.

62. Upon information and belief, Defendants have never applied to the Commissioner of Banks for a license to be a lender to North Carolina borrowers, such as Plaintiffs and the Class.

63. Upon information and belief, Defendants have never had a consumer finance license permitting them to make loans to North Carolina borrowers, such as Plaintiffs and the Class.

64. Accordingly, Inbox Loan's and the Kashia Band's loans to North Carolina residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to attempt to collect or collect any principal or interest on the loans.

65. At the time that Inbox Loan and the Kashia Band made its loans to Plaintiffs and the Class, Defendants were aware that North Carolina law prohibits usurious rates on the loans, as defined in N.C. Gen. Stat. §§ 24-1.1, 53-176, and that their lending practices were at interest rates constituting usury.

66. Under the terms of the standard loan agreement, the interest rates charged by Inbox Loan and the Kashia Band were *twenty-five times greater* greater than the maximum legal rate that can be charged under North Carolina law, even if they had the requisite North Carolina license.

67. Through advertising, marketing, and contracting, Defendants targeted North Carolina consumers as part of its lending practices, including the loans to Plaintiffs.

11

68.     Defendants chose North Carolina as a place where loans and collection efforts would ensue and participated in and knew of the actions of the other Defendants in North Carolina.

### D. Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable

69.     Because the loans were made and collected without a North Carolina consumer finance license, and because the loans carried an interest rate in excess of the maximum rate permitted under North Carolina law, whether licensed or not, the Inbox Loan agreements are void and unenforceable.

70.     The Inbox Loan agreement not only violates North Carolina's consumer lending statutes and the public policy against usurious loans, but it also contains unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim laws and legal rights and ultimately deprive consumers of their day in court.

71.     For example, Defendants' Loan Agreement with Plaintiffs provides:

> GOVERNING LAW: The laws of the Tribe will govern this Loan Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between You and Us, Tribal law shall exclusively apply to such dispute.
>
> SOVEREIGN IMMUNITY: This Loan Agreement and all related documents are being submitted by You to Us as an economic arm, instrumentality, and wholly owned business entity of the Tribe. The Tribe is a federally-recognized Indian tribe and enjoys governmental sovereign immunity. Because We and the Tribe are entitled to sovereign immunity, You will be limited as to what claims, if any, You may be able to assert against the Tribe and Us. To encourage resolution of consumer complaints, any complaint may be submitted by You or on Your behalf to the Tribe for review as described below.
>
> PRESERVATION OF SOVEREIGN IMMUNITY: Inbox Loan is a wholly-owned subsidiary of Kashia Services, a business entity wholly owned by the Kashia Band of Pomo Indians of the Stewarts Point Rancheria, a federally recognized Indian tribe that, along with its governmental departments and agencies and economic enterprises, possesses sovereign immunity from unconsented suit. This means that

12

no legal action may be brought against the Tribe in general, Kashia Services or Inbox Loan, without the consent of that party.

TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION

If You have a question or grievance concerning Your Loan or any aspect of this Agreement, you must first contact Us by telephone at 800-930-9066 or in writing via fax at 707-239-8000 or e-mail to loan@inboxloan.com. We will make our best effort to answer Your question or resolve Your grievance within seven (7) days of receipt of Your inquiry. If You are dissatisfied with Our response, You may submit a written request for review to the Board of Directors of Kashia Services, PO Box 881, Santa Rosa, CA 95406. The Board must receive Your written request for review within fifteen (15) business days after You receive a response to Your initial inquiry from Customer Service, and will make its best effort to respond to Your Claim within ten (10) business days thereafter. If You are dissatisfied with the Board's response, You may initiate a formal dispute resolution process by filing a written Claim with the Kashia Lending Commission following the procedures provided to You by the Board along with its response. Any Claim that You file must be submitted within fifteen (15) business days after receipt of the Board's response, must describe the dispute along with the relief that You are seeking, and must otherwise comply with the procedural and substantive requirements of Tribal Law. In order to be considered. Copies of applicable Tribal Laws may be obtained by contacting Us at the telephone number or email address provided above. Claims will be processed by the Kashia Lending Commission in accordance with Tribal Law.

THIS TRIBAL DISPUTE RESOLUTION PROCEDURE IS INTENDED AS THE SOLE DISPUTE RESOLUTION MECHANISM FOR DISPUTES AND CLAIMS ARISING UNDER THIS LOAN AGREEMENT. THIS MEANS THAT YOU ARE EFFECTIVELY WAIVING YOUR RIGHT TO A JURY TRIAL.

The words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to this Tribal Dispute Resolution Provision, ("this Provision"), the validity and scope of this Provision and any claim or attempt to set aside this Provision; (b) all U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Loan Agreement, the information You gave Us before entering into this Loan Agreement, including the customer information application, and/or any past Loan Agreement or Agreements between You and Us; (c) all counterclaims, cross-claims and third-party claims; (d) all common law claims, based upon contract, tort, fraud, or other

13

intentional torts; (e) all claims based upon a violation of any state or federal constitution, statute or regulation; (f) all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe Us; (g) all claims asserted by You individually against the Tribe, Us and/or any of our employees, agents, directors, officers, governors, managers, members, parent company or affiliated entities (collectively, "related third parties"), including claims for money damages and/or equitable or injunctive relief; (h) all claims asserted on Your behalf by another person; (i) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against Us and/or related third parties ("Representative Claims"); and/or (j) all claims arising from or relating directly or indirectly to the disclosure by Us or related third parties of any non-public personal information about You. All disputes including any Representative Claims against Us and/or related third parties shall be resolved by the Tribal Dispute Resolution Procedure in this Provision only on an individual basis with You. Any party to a dispute, including related third parties, may send the other party written notice by certified mail return receipt requested of their dispute and setting forth the subject of the dispute along with the relief requested. This Provision is binding upon and benefits You, Your respective heirs, successors and assigns. This Provision is binding upon and benefits the Tribe, Us, our successors and assigns, and related third parties. This Provision continues in full force and effect, even if Your obligations have been paid or discharged through bankruptcy. This Provision survives any cancellation, termination, amendment, expiration or performance of any transaction between You and Us and continues in full force and effect unless You and We otherwise agree in writing.

Exhibit A, Gonzalez Loan Agreement at 4–5; Exhibit B, Gary Loan Agreement at 4–5.

72.    The governing law and forum selection clauses contain form language included in all loan agreements involving Inbox Loan.

73.    The Inbox Loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

74.    Defendants' choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

75.    Defendants' choice-of-law provision is unenforceable as a matter of North Carolina law because it purports to disclaim the application of all state law.

14

76.     Defendants voluntarily chose to do business with consumers in North Carolina, and under the applicable statutory and precedential case law, North Carolina and federal law applies because, *e.g.* the last act necessary to formation of the Inbox Loan agreements with Plaintiffs and the Class was in North Carolina where the consumer signature occurred; the extension of credit is deemed to have been made in North Carolina by offering or agreeing in North Carolina to lend to a borrower who is a resident of the State, and additionally by the borrower accepting and being offered the loan in the State, "regardless of the situs of the contract as specified therein" (N.C. Gen. Stat. § 24-2.1); contracts made in a foreign State or country with the intent and purpose to evade the usury laws of North Carolina are invalid; and enforcement of the choice of law provision would "violate a fundamental policy" of North Carolina law prohibiting usury; loan agreements cannot seek to waive federal statutory rights.

77.     Likewise, the forum selection clause is unenforceable because it deprives North Carolina borrowers of any forum to bring state or federal law claims.

78.     The loan agreement disclaims that Plaintiffs and the Class have any right to pursue litigation in court. Exhibit A, Gonzalez Loan Agreement at 5; Exhibit B, Gary Loan Agreement at 5 ("YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES"; "YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES").

79.     Instead, the Tribal Dispute Resolution Procedure only purports to allow consumers to follow a "formal dispute resolution" with the Tribe's "Kashia Lending Commission" in accordance with procedure and substance of "Tribal Law." *Id.*

80.     Because of the purported sovereign immunity, "no legal action may be brought against the Tribe in general, Kashia Services or Inbox Loan, without the consent of that party." *Id.*

15

81. The loans at issue are not on-reservation activity and not necessary to protect tribal self-government or internal relations.

82. The Inbox Loan contract also violates its own Kashia Band ordinances by not conducting the lending business consistent with all "applicable laws." *See* Exhibit C, Kashia Band Lending Business Ordinance #13 at 1-2, 6, 9; Exhibit D, Kashia Band Lending Regulatory Ordinance #12 at 1-3, 7, 9-10.

83. Additionally, Inbox Loan's homepage confusingly provides that it "abides by all applicable federal laws and regulations *as established by* the Kashia Band of Pomo Indians of the Stewarts Point Rancheria," https://www.inboxloan.com/ (last visited 1/2/19) (emphasis added).

84. Through the Kashia Band ordinances and class action waiver provision, Defendants seek to deprive borrowers of any just and cost-effective means of seeking redress for Defendants' wrongful acts.

85. The loan agreement seeks to strip Plaintiffs and the Class of the opportunity to pursue their claims as a class action. Exhibit A, Gonzalez Loan Agreement at 5–6; Exhibit B, Gary Loan Agreement at 5–6 ("YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST US AND/OR RELATED THIRD PARTIES.")

86. The class action waiver clause violates Plaintiffs' statutory right to maintain a class action to redress the misconduct in accordance with North Carolina law. N.C. Gen. Stat. § 1A-1, Rule 23.

87. In essence, Defendants seek to use the forum selection and choice of law clauses to convert the terms of the Inbox Loan agreement into "a choice of no law clause," making it invalid

16

and unenforceable. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

### E. Payday Loans and Similar Loan Arrangements Unlawful In North Carolina and Not Insulated By Purported Tribal Immunity

88.     Like many states, North Carolina prohibits payday loans and similar predatory loan arrangements.[1] Inbox Loan states that residents from a number of states "are not eligible to receive a loan" through the Inbox Loan website, including Arkansas, Connecticut, Georgia, New York, Minnesota, South Dakota, Utah, Vermont, Virginia, and West Virginia. *See* https://www.inboxloan.com/ (accessed 1/2/19). It did not include North Carolina on its list of prohibited states, but it should have.

89.     On October 1, 1997, the North Carolina General Assembly passed the North Carolina Check Cashing Act ("NCCCA"). N.C. Gen. Stat. § 53-276. This Act permitted payday loans in North Carolina but required that they be no more than $300 including fees, contain a maturity date not more than thirty-one days after the loan was issued, and required that the total fees not exceed 15% of the face value of the check. N.C. Gen. Stat. § 53-281 (b-d). Furthermore, the NCCCA required that all payday lenders be licensed by the state of North Carolina as check cashers. *Id.*

90.     The NCCCA contained a "sunset date" of July 31, 2001. *In re Advance Am., Cash*

---

[1] The term "payday loan" refers to "small, high-interest, short-term cash loans." E.g., Dillon v. BMO Harris Bank, N.A., 787 F.3d 707, 710 n.2 (4th Cir. 2015). Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. Installment loans and other similar loan arrangements may be treated as unlawful payday lending practices when they share many of the same substantive features of "payday loans," including, *e.g.*, providing minimal personal and financial information, in exchange for immediate cash payments, which the debtor is obligated to repay both the cash advance and periodic accrued payments over a period of time. *See infra*. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to loans of $25,000 or less made to North Carolina borrowers at interest rates that exceed an annual percentage rate ("APR") of 16 percent. N.C. Gen. Stat. § 24-1.1.

*Advance Centers of N.C., Inc.,* No. 05:008:CF, 7 (Comm'r of Banks, Dec. 22, 2005). The North Carolina General assembly extended this date until August 31, 2001, and the NCCCA was allowed to expire on August 31, 2001. *Id.*

91.     The NCCCA expiration on August 31, 2001, however, did not put an end to the payday lending industry in North Carolina. While some payday lenders ceased operations, others merely masked their schemes by employing designs that *resembled* "payday lending" practices, but did not fit the traditional definition, such as providing limited information, in exchange for immediate cash payment, which the consumer must pay plus periodic accrued payments at usurious rates over a period of time. *State ex rel. Cooper v. NCCS Loans, Inc.,* 174 N.C. App. 630, 635–36, 624 S.E.2d 371, 375 (2005).

92.     One "[f]ormer payday lender operated an Internet service 'rebate' scheme where customers received an instant cash 'rebate' that had to be repaid through a long-term Internet contract." *Id.* at 374. The courts looked at this transaction and determined it was essentially a guise for a payday lending business and held that it violated North Carolina usury laws (N.C. Gen. Stat. § 24-1.1), the North Carolina Consumer Finance Act (N.C. Gen. Stat. § 53-166), and the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1). *State ex rel. Cooper v. NCCS Loans, Inc.* 624 S.E.2d at 375, 376.

93.     After the holding in *State ex rel. Cooper v. NCCS Loans, Inc.,* North Carolina courts continued their crack-down of these type of lending practices, holding that various payday lending schemes similarly violated North Carolina's usury statute, its Consumer Finance Act, and that payday lending in North Carolina constitutes unfair and deceptive trade practices. *See, e.g., Odell v. Legal Bucks, LLC,* 665 S.E.2d 767, 781, 192 N.C.App. 298, 320 (N.C. App. 2008) (cash advance lender was not licensed, and the transaction was akin to a payday loan that violated the CFA and was not disclosed as violating the CFA, so it was a deceptive trade practice); *Gunnings v. Internet Cash*

18

*Enterprise of Asheville, LLC*, 2007 WL 1931291, at *6 (W.D.N.C. 2007) (individuals who ran a cash advance entity that contended to be a payday lender could be held liable for deceptive trade practices individually as controlling an entity engaged in payday lending); *Dillon v. BMO Harris Bank, N.A.*, 16 F.Supp.3d 605, 620 (M.D.N.C. 2014) (North Carolina chartered-banks and nationally-chartered banks exempt under CFA, but subject to deceptive trade practice act).

94. Ten years after the clear prohibition against payday loans and similar predatory lending practices in North Carolina, the North Carolina Attorney General sought to further curb the practice by bringing an action against a Native American Tribe who claimed to be immune from liability. The North Carolina business court held tribal sovereign immunity did not insulate the tribe from being held liable under the applicable usury laws, the Consumer Finance Act, or the Unfair & Deceptive Trade Practice Act. *State ex rel. Cooper v. Western Sky Financial, LLC*, 2015 WL 5091229, at *10 (N.C. Super. 2015).

### F. Class Definition

95. Plaintiffs Shannon Gonzalez and Bronal Gary bring this action under North Carolina Rule of Civil Procedure 23 on behalf of the following class of persons (the "Class"), subject to modification after discovery and case development:

> All persons: (1) who executed a loan of $25,000 or less with Inbox Loan, (2) at an annual interest rate of more than 16% per annum, (3) when they resided or had an address in North Carolina, (4) from July 1, 2013 through the date class notice is disseminated.

96. Plaintiff Shannon Gonzalez brings an action (Counts V, VII and VIII below) under North Carolina Rule of Civil Procedure 23 on behalf of the following sub-class of persons (the "sub-class"), subject to modification after discovery and case development:

> All persons: (1) who executed a loan of $25,000 or less with Inbox Loan, (2) at an annual interest rate of more than 16% per annum, (3) when they resided or had an address in North Carolina, (4) from July 1, 2013 through the date class notice is disseminated.
>
> And (5) against whom Defendant TrueAccord Corp. attempted to collect a debt on said

19

loan.

97.     Numerosity. Upon information and belief, Class and sub-class members are so numerous that joinder is impractical, likely numbering in the thousands. The names and addresses of the Class and sub-class members are identifiable through the internal business records maintained by Defendants, and the Class and sub-class members may be notified of the pendency of this action by email, published, and/or mailed notice.

98.     Predominance of Common Questions of Law and Fact. Common questions of law and fact exist as to all members of the Class and sub-class. These questions predominate over the questions affecting only individual Class or sub-class members. These common questions include, as to the Class and sub-class:

(a)     Whether Defendants made usurious loans to North Carolinians by charging more than 16% APR for loans of $25,000 or less;

(b)     Whether Defendants' loans in North Carolina constitute illegal "payday loans" under state law;

(c)     Whether Defendants' acts and/or practices in the conduct of commerce were unfair and/or deceptive;

(d)     Whether Defendants retained an unjust benefit because the loans were void;

(e)     Whether the choice-of-law, forum selection, dispute resolution, and class action waiver provisions in the standard Inbox Loan agreement violated North Carolina law, offended public policy interests, and should be deemed unenforceable;

(f)     Whether the failure to obtain the requisite license rendered the Inbox Loan's contracts in North Carolina void and/or unenforceable;

(g)     Whether Defendants violated the Truth in Lending Act through disclosure of an interest rate and finance change not permitted by law;

20

(h)    Whether TrueAccord's debt collection on the unlawful Inbox Loan agreements violated the Fair Debt Collection Practices Act;

(i)    What is the proper recovery for Plaintiffs and the Class members against each Defendant.

99.    Typicality. Plaintiffs' claims are typical of the claims of each Class member. Plaintiff Gonzalez's claim in Count is typical of the claims of each sub-class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the Class. All are based on the same material facts and legal theories.

100.    Adequacy of Representation. Plaintiffs are adequate representatives of the Class and sub-class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seeks to represent; and they have prosecuted and intend to continue to prosecute the action vigorously. Plaintiffs have retained counsel competent and experienced in such litigation, including illegal debt collection and lending law class actions in state and federal court. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class and sub-class. Neither Plaintiff nor their counsel have interests which might cause them not to vigorously pursue this action.

101.    Superiority. A class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Class or sub-class individually to effectively redress the wrongs done to them. Even if the members of the Class or sub-class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action

21

device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

## VII.   CAUSES OF ACTION

### COUNT I – VIOLATION OF NORTH CAROLINA CONSUMER FINANCE ACT
N.C. GEN. STAT. § 53–164, ET SEQ.
(Plaintiffs Against Inbox Loan and the Kashia Band)

102.     The North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-166(a), requires that any person engaged in the business of lending cannot "directly or indirectly" contract for or receive consideration greater than that allowed by Chapter 24 without being licensed by the Commissioner of Banks as a consumer finance lender. Specifically, N.C. Gen. Stat. § 53-166(a) provides, in pertinent part:

> No person shall engage in the business of lending in amounts of fifteen thousand dollars ($15,000) or less and contract for, exact, or receive, directly or indirectly, on or in connection with any such loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, which in the aggregate are greater than permitted by Chapter 24 of the General Statutes, except as provided in and authorized by this Article, and without first having obtained a license from the Commissioner.

103.     The maximum rate allowed by Chapter 24, N.C. Gen. Stat. § 24-1.1, on loans of $25,000 or less, is 16% per annum.

104.     The North Carolina Consumer Finance Act provides an exception to the 16% cap on interest rates set forth by Chapter 24, and allows consumer finance lenders licensed by the Commissioner of Banks to make consumer loans of up to $15,000 at interest rates permitted by the Act.

105.     For licensed loans made on or after July 1, 2013, pursuant to N.C. Gen. Stat. § 53-176, the maximum interest rate that may be charged for consumer loans in North Carolina under the

22

Act is 30% per annum.

106. Inbox Loan, purportedly owned and controlled by the Kashia Band, has engaged in the business of lending and are therefore subject to the provisions of the Consumer Finance Act, including N.C. Gen. Stat. § 53-166. Upon information and belief, they are not licensed as consumer finance lenders by the Commissioner of Banks, and have never been so licensed.

107. Inbox Loan and the Kashia Band have regularly made consumer loans to North Carolina borrowers at rates far in excess of the allowable limits in the Consumer Finance Act, which can be seen on the face of each loan contract, and which they have done knowingly, recklessly, and with intent.

108. Through Plaintiffs' and the Class's Inbox Loan agreements, there was an understanding that money owed would be paid, an agreement to pay interest at a rate greater than allowed by law, and Inbox Loan and the Kashia Tribe had corrupt intent to received more in interest than the legal rate permits for use of the money loaned in North Carolina.

109. As an unlicensed lender, Inbox Loan and the Kashia Band charged a rate of interest on a small loan to Plaintiffs and the Class greater than the rates permitted, and would have exceeded the maximum APR even had they been properly licensed..

110. Pursuant to N.C. Gen. Stat. § 53-166(d), all loans from Inbox Loan and the Kashia Band made to North Carolina borrowers in violation of the Consumer Finance Act and held or collected on by any of the Defendants, or any of their affiliates are void. Defendants are expressly prohibited under the Act from collecting, receiving, or retaining any principal or charges made or collected on by Defendants from North Carolina borrowers.

111. Pursuant to N.C. Gen. Stat. § 53-190(a), all such loans made to North Carolina borrowers in violation of the North Carolina Consumer Finance Act are unenforceable in North Carolina notwithstanding Defendants' efforts to style the loans as having been made through the

23

Kashia Band. N.C. Gen. Stat. § 53-190(a) provides:

> No loan contract made outside this State in the amount or of the value of ten thousand dollars ($10,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.

112.    Defendants' loans are therefore unenforceable pursuant to N.C. Gen. Stat. § 53-190(a) because the following contractual activities, among others, undisputedly occur in North Carolina:

(a)     Soliciting North Carolina resident borrowers through the Internet, telephone, and other means which have targeted and reached North Carolina borrowers in their homes;

(b)     Discussing with North Carolina resident borrowers the loans over the Internet or by telephone with borrowers in their homes or while such borrowers were located in North Carolina;

(c)     Transmitted the loan documents to North Carolina resident borrowers while the borrowers were located in North Carolina;

(d)     Executing the electronic signatures of the loan documents through the North Carolina borrowers' computers located in the borrowers' homes or elsewhere in North Carolina purportedly after their review of the contracts in North Carolina;

(e)     Disbursing loan funds to North Carolina borrowers and borrowers' banks and bank accounts located in North Carolina;

(f)     Incurring incidental costs, such as bank fees associated with the loans in North Carolina; and

(g)     Receiving loan payments from North Carolina borrowers from funds in borrowers'

24

bank accounts located in North Carolina.

113.     Further, N.C. Gen. Stat. § 53-180(g) prohibits deceptive acts or practices both with regard to the making of loans and collecting or attempting to collect money alleged to be due under loans subject to the Act.

114.     Accordingly, Defendants' activities are prohibited by the North Carolina Consumer Finance Act. Plaintiffs and the Class seek a declaration that the Inbox Loan agreements violate the North Carolina Consumer Finance Act and are illegal, void, and unenforceable; forgiveness of debt; forfeiture of interest owed and/or paid; recovery of double damages pursuant to N.C. Gen. Stat. § 24-2 for all usurious interest; injunctive relief prohibiting Defendants from offering or making any consumer loans to North Carolina borrowers in violation of the North Carolina Consumer Finance Act and from collecting on or retaining any principal or charges collected from North Carolina borrowers on such loans; and all other recovery permitted by law.

COUNT II – VIOLATION OF NORTH CAROLINA USURY STATUTE
NORTH CAROLINA GENERAL STATUTES CHAPTER 24
(Plaintiffs Against Inbox Loan and Kashia Band)

115.     By the same conduct, Defendants have similarly violated North Carolina's Chapter 24 prohibitions on usury. *Odell v. Legal Bucks*, LLC, 192 N.C. App. 298, 317, 665 S.E.2d 767, 779–80 (2008) ("For an unlicensed lender to charge a rate of interest on a small loan greater than the rates permitted is a violation both of the Consumer Finance Act, and of Chapter 24's prohibitions on usury.").

116.     North Carolina usury laws instruct that the protection of North Carolina borrowers from illegal, usurious loans is a "paramount public policy" of the State, as N.C. Gen. Stat. § 24-2.1(g) mandates: "It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws."

117.     North Carolina usury law, N.C. Gen. Stat. § 24-1.1, provides that the maximum

25

interest rate that may be charged on loans of $25,000 or less is 16% per annum.

118. North Carolina's usury laws mandate that they are to be applied to protect North Carolina resident borrowers, "regardless of the situs of the contract," as N.C. Gen. Stat. § 24-2.1(a) and (b) provide:

(a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this state, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.

(b) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to and received by a lender outside of this State, shall be deemed to be an acceptance of offer to borrow in this State.

119. Defendants' consumer loans to North Carolina borrowers, including Plaintiff and the Class, are usurious because the rates and charges of such loans grossly exceed the rates and charges permitted by North Carolina usury law, which is evident from the face of the loan contracts, and which Defendants have done knowingly, recklessly, and with intent.

120. Through Plaintiffs' and the Class's Inbox Loan agreements, there was an understanding that money owed would be paid, an agreement to pay interest at a rate greater than allowed by law, and Inbox Loan and the Kashia Tribe had corrupt intent to received more in interest than the legal rate permits for use of the money loaned in North Carolina.

121. As an unlicensed lender, Inbox Loan and the Kashia Band charged a rate of interest on a small loan to Plaintiffs and the Class greater than the rates permitted, and would have exceeded the maximum APR even had they been properly licensed.

122. Plaintiffs and the Class seek a declaration that the Inbox Loan agreements violate the North Carolina Chapter 24 usury statute and are illegal, void, and unenforceable; forgiveness of debt; forfeiture of interest owed and/or paid; recovery of double damages pursuant to N.C. Gen. Stat. § 24-2 for all usurious interest; injunctive relief prohibiting Defendants from offering or making

26

any consumer loans to North Carolina borrowers in violation of the North Carolina Chapter 24 usury statute and from collecting on or retaining any principal or charges collected from North Carolina borrowers on such loans; and all other recovery permitted by law.

### COUNT III – VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT N.C. GEN. STAT. § 75-1.1
(Plaintiffs Against Inbox Loan, the Kashia Band, and TrueAccord)

123. Defendants engaged in "commerce" as defined by N.C. Gen. Stat. § 75-1.1, through the lending enterprise as described in this Complaint, including the Kashia Band's operation of Inbox Loan to solicit, advertise, and contract with North Carolina consumers like Plaintiffs and the Class with respect to the Inbox Loan agreements in a predatory, usurious manner while claiming complete immunity for their actions, and the hiring of TrueAccord to attempt to collect and collect on the unlawful debts not owed and in a harassing manner, which it did so knowingly.

124. The North Carolina UDTPA prohibits any "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. N.C. Gen. Stat. § 75-1.1.

125. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and a "practice is deceptive if it has the capacity or tendency to deceive." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007) (citation and quotation marks omitted).

126. Courts in North Carolina have held that failure to inform a consumer that the loan documents were being executed in violation of North Carolina's Consumer Finance Act or other laws can serve as a deceptive practice under the NC UDTPA. *See Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 319–20, 665 S.E.2d 767, 780–81 (2008).

127. Moreover, "violations of statutes designed to protect the consuming public and violations of established public policy may constitute unfair and deceptive trade practices," and that

27

"it is a paramount public policy of North Carolina to protect North Carolian resident borrowers through the application of North Carolina interest laws." *Id.* (citing N.C. Gen.Stat. § 24-2.1).

128. Defendants' illegal Inbox Loan contracts, and collection efforts on those loans, had the capacity to deceive and did deceive Plaintiffs and the Class into believing they had to pay on debts not in fact legally owed.

129. In the course of offering, arranging, making and collecting on their illegal consumer loans, Defendants engaged in unfair and deceptive acts or practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

130. Defendants' unfair and deceptive acts or practices include, but are not limited to, the following:

    (a) Engaging in an unfair business enterprise of offering, making, and collecting on consumer loans to North Carolina borrowers, when such loans are in gross violation of the usury laws of this State and violate the public policy of this State;

    (b) Continuing to offer, make, and collect on consumer loans in willful violation of North Carolina law, despite being aware that such loans are in violation of North Carolina law;

    (c) Making and collecting on loans at oppressive and unfair rates, and making such loans without accounting for the borrower's ability to repay;

    (d) Taking advantage of consumers in claiming and collecting amounts not owed;

    (e) Attempting to circumvent North Carolina lending and consumer protection laws by deceptively asserting that such loans are made by an Indian tribe and are not subject to North Carolina lending laws, despite the fact that they cannot evade state and federal lending and collections laws; and

131. Defendants never informed Plaintiffs or the Class that the loans were illegal under

28

North Carolina usury, consumer finance, and other state and federal laws.

132. As a result of Defendant's UDPTA violations, Plaintiffs and the Class suffered substantial damage, including but not limited to financial damage incurred from payments and/or other expenses associated with the illegal loans.

133. Plaintiffs and the Class seek compensatory damages, statutory damages, including up to treble damages, attorneys' fees and costs, injunctive relief to restrain Defendants from further violations of N.C. Gen. Stat. § 75-1.1, as well as all other relief which may be due and owing under the Act. *E.g.*, N.C. Gen. Stat. §§ 75-16, 75-16.1, 75-19.

COUNT IV – VIOLATION OF NORTH CAROLINA DEBT COLLECTION ACT
N.C. Gen. Stat. §§ 75-54, 75-55
(Plaintiffs Against Inbox Loan and the Kashia Band)

134. Plaintiffs and the Class are "consumers" as defined by N.C. Gen. Stat. § 75-50(1) when they entered into the Inbox Loan agreements.

135. Defendants are "debt collectors" as defined by N.C. Gen. Stat. § 75-50(3) as "any person engaging, directly or indirectly, in debt collection from a consumer." Inbox Loan and the Kashia Band hired TrueAccord to collect the debts from Plaintiff and the Class on the Inbox Loan agreements.

136. Defendants falsely represented the character, extent, or amount of a debt against a consumer under N.C. Gen. Stat. § 75-54, when it attempted to collect or collected on the illegal Inbox Loan agreements not owed under North Carolina law from Plaintiffs and the class.

137. Defendants collected or attempted to collect from consumers, including Plaintiffs and the class, interest or other charge, fee or expense incidental to the principal debt not legally owed, due to the illegality of the usurious Inbox Loan agreements under North Carolina law. N.C. Gen. Stat. § 75-55.

138. As a result of Defendants' NCDCA violations, Plaintiffs and the Class suffered

29

substantial damage, including but not limited to financial damage incurred from Defendant's illegal loan agreements.

139.    Plaintiffs and the Class seek compensatory damages, statutory damages, as well as all other relief which may be due and owing under the Act. *E.g.*, N.C. Gen. Stat. § 75-56.

COUNT V – VIOLATION OF NORTH CAROLINA COLLECTION AGENCY ACT<br>N.C. Gen. Stat. § 58-70-110, 58-70-115<br>(Plaintiff Gonzalez Against TrueAccord)

140.    Plaintiff Gonzalez and the sub-class are "consumers" as defined by N.C. Gen. Stat. § 58-70-90 when they entered into the Inbox Loan agreements.

141.    TrueAccord is a "collection agency" as defined by N.C. Gen. Stat. §§ 58-70-15, 58-70-90, as "a person directly or indirectly engaged in soliciting, from more than one person delinquent claims of any kind owed or due or asserted to be owed or due the solicited person and all persons directly or indirectly engaged in the asserting, enforcing or prosecuting of those claims," from consumers. Inbox Loan and the Kashia Band hired TrueAccord to collect the debts from Plaintiff Gonzalez and the sub-class on the Inbox Loan agreements in the manner described in this Complaint.

142.    Defendant falsely represented the character, extent, or amount of a debt against a consumer under N.C. Gen. Stat. § 58-70-110, when it attempted to collect or collected on the illegal Inbox Loan agreements not owed under North Carolina law from Plaintiff Gonzalez and the sub-class.

143.    Defendant collected or attempted to collect from consumers, including Plaintiff Gonzalez and the sub-class, interest or other charge, fee or expense incidental to the principal debt not legally owed, due to the illegality of the usurious Inbox Loan agreements under North Carolina law. N.C. Gen. Stat. § 58-70-115.

144.    As a result of Defendant's Collection Agency Act violations, Plaintiff Gonzalez and

30

the sub-class suffered substantial damage, including but not limited to financial damage incurred from Defendants' illegal loan agreements.

145.    Plaintiff Gonzalez and the sub-class seek compensatory damages, statutory damages, as well as all other relief which may be due and owing under the Act. *E.g.*, N.C. Gen. Stat. § 58-70-130.

COUNT VI – VIOLATION OF TRUTH IN LENDING ACT
*15* U.S.C. § 1601 *ET SEQ.*
(Plaintiffs Against Inbox Loan and the Kashia Band)

146.    The Truth In Lending Act ("TILA") requires creditors to provide accurate disclosure to consumer borrowers, including the finance charge and annual percentage rate for every loan, 12 C.F.R. § 1026.18.

147.    The disclosure must be based on the actual "legal obligation" of the borrower, 12 C.F.R. § 1026.17(c)(1), so the disclosure of a usurious rate of interest and amount due based on it is not accurate of the obligation legally required and violates the act.

148.    Inbox Loan, owned and controlled by Kashia Band, disclosed the interest rate of 773.91% APR to Plaintiffs even though the rate was far in excess of her actual legal obligation under North Carolina law, like other Class members.

149.    The disclosure of an annual percentage rate in excess of the actual legally enforceable rate violates TILA. 12 C.F.R. § 1026.22(a)(2) ("As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of 1 percentage point above or below the annual percentage" rate correctly determined).

150.    Defendants participated directly in the dissemination of inaccurate, miscalculated TILA disclosures. Inbox Loan and Kashia Band determined the illegal annual percentage rate and finance charge, and they supervised the dissemination of these inaccurate disclosures in the loan agreements with North Carolina borrowers, including Plaintiffs and the Class.

31

151. Plaintiffs and the Class's Inbox Loan agreements also falsely stated that only tribal, not federal or state, laws applied.

152. Plaintiffs and the Class made payments associated with the illegal loans set at usurious rates based on the false information in their Inbox Loan agreements.

153. Inbox Loan and the Kashia Band are creditors as defined by TILA.

154. Plaintiffs and the Class are entitled to actual and statutory damages, fees and costs, and all other relief allowed by law under TILA. 15 U.S.C. § 1640(a).

COUNT VII – VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
15 U.S.C. § 1692F
(Plaintiff Gonzalez Against TrueAccord)

155. The Fair Debt Collection Practices Act ("FDCPA") prohibits the use of "unfair or unconscionable" means of collecting or attempting to collect debt, including, *e.g.*, the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" that is not "permitted by law." 15 U.S.C. § 1692f(1).

156. Plaintiff Gonzalez and the sub-class are "consumers" as defined by 15 U.S.C. § 1692a(3) because they are natural persons allegedly obligated to pay a debt.

157. TrueAccord is a "debt collector" as defined by 15 U.S.C. § 1692a(6) because it uses instrumentalities of interstate commerce, such as email, phone, and United States mail, in its business the principal purpose of which is the collection of debts, and regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another—including as to Plaintiff Gonzalez and the sub-class, Inbox Loan and the Kashia Band.

158. TrueAccord attempted to collect a debt as defined by 15 U.S.C. § 1692a(5) because Plaintiff Gonzalez and the sub-class were allegedly obligated to pay the usurious interest and principal on their loans, received for family, household, or personal purposes.

159. TrueAccord attempted to collect the alleged consumer debt not permitted by law

32

through frequent contacts, including by email and phone, to Plaintiff Gonzalez and the sub-class demanding payment of the illegitimate debt that included the usurious interest rates associated with the illegal Inbox Loan agreements for Inbox Loan.

160.    Because of TrueAccord's FDCPA violations, Plaintiff Gonzalez and the sub-class suffered substantial damage, including payments associated with the illegitimate debt and deprivation of the statutory right to receive accurate information concerning the amount of debt owed.

161.    Plaintiff Gonzalez and the sub-class are entitled to compensatory damages, statutory damages, attorneys' fees and costs, and injunctive relief prohibiting TrueAccord from continuing to contact and attempt to collect on the illegal Inbox Loan debts in North Carolina.

COUNT VIII – VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT<br>15 U.S.C. § 1692E<br>(Plaintiff Gonzalez Against TrueAccord)

162.    The FDCPA prohibits debt collectors from "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt," including, e.g, the "false representation of" the "character, amount, or legal status of any debt"; the "representation or implication that nonpayment of any debt will result in . . . garnishment" of wages" if "unlawful"; the "threat to take any action that cannot legally be taken or that is not intended to be taken"; "communicating or threatening to communicate" credit information "known" or "should be known to be false"; and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e.

163.    Plaintiff Gonzalez and the sub-class are "consumers" as defined by 15 U.S.C. § 1692a(3) because they are natural persons allegedly obligated to pay a debt.

164.    TrueAccord is a "debt collector" as defined by 15 U.S.C. § 1692a(6) because it uses instrumentalities of interstate commerce, such as email, phone, and United States mail, in its business the principal purpose of which is the collection of debts, and regularly collects or attempts

33

to collect, directly or indirectly, debts owed or due or asserted to be owed or due another—including as to Plaintiff Gonzalez and the sub-class, Inbox Loan and the Kashia Band.

165.    TrueAccord attempted to collect a debt as defined by 15 U.S.C. § 1692a(5) because Plaintiff Gonzalez and the sub-class were allegedly obligated to pay the usurious interest and principal on their loans, received for family, household, or personal purposes.

166.    TrueAccord falsely represented the character, amount, and legal status of the alleged debt when it contacted Plaintiff Gonzalez and the sub-class on several occasions demanding payment of an illegal loan from Inbox Loan, including the illegitimate usurious interest rates.

167.    Through TrueAccord's attempts to enforce the illegal Inbox Loan agreements, TrueAccord unlawfully implied that nonpayment of the debt would result in their employers' deductions of their wages, that their failure to pay would be reported to credit reporting agencies, and that other adverse consequences also included in the terms of their illegal Inbox Loan agreements would occur.

168.    TrueAccord's means of debt collection was deceptive and representations that the debt was owed and suggestions that the loan agreement terms were enforceable were false.

169.    Because of TrueAccord's FDCPA violations, Plaintiff Gonzalez and the sub-class suffered substantial damage, including payments associated with the illegitimate debt and deprivation of the statutory right to receive accurate information concerning the amount of debt owed.

170.    Plaintiff Gonzalez and the sub-class are entitled to compensatory damages, statutory damages, attorneys' fees and costs, and injunctive relief prohibiting TrueAccord from continuing to contact and attempt to collect on the illegal Inbox Loan debts.

171.    Plaintiff Gonzalez and the sub-class are entitled to compensatory damages, statutory damages, attorneys' fees and costs, and injunctive relief prohibiting TrueAccord from continuing to contact and attempt to collect on the illegal Inbox Loan debts in North Carolina.

34

## COUNT IX – UNJUST ENRICHMENT
(Plaintiffs Against Inbox Loan, Kashia Band, and TrueAccord)

172. Plaintiffs' and the Class's loans made by Inbox Loan and the Kashia Band, and collected or attempted to collect by TrueAccord, were void and illegal.

173. Plaintiffs and Class members conferred a measurable benefit on each of the Defendants when they entered into usurious loan agreements with Inbox Loan, owned and controlled by Kashia Band, who knowingly and voluntarily entered into the predatory and usurious loan agreements affording them large and unlawful gains on their loans.

174. Inbox Loan, owned and controlled by Kashia Band, then hired TrueAccord, who was aware of the usurious loan agreements, to harass and collect on the illegal debts for its own profit, which it did.

175. Defendants were unjustly enriched by knowingly and voluntarily accepting the benefit therefrom, which Plaintiffs and the Class did not give gratuitously or officiously.

176. The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

177. Accordingly, Plaintiffs and the Class seek to recover from Defendants jointly and severally, all ill-gotten gains, including as to Inbox Loan and the Kashia Band, forgiveness of debt purportedly owed on the illegal loan agreements and any payments paid thereon, and as to TrueAccord, any profits received in connection with collection or attempted collection of the debts on the illegal loan agreements with Plaintiffs and the Class.

35

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court enter judgment on behalf of themselves and the Class they seeks to represent against Defendants as follows:

(a) Plaintiffs and all class members be awarded actual damages, including but not limited to forgiveness of all debt not legally owed;

(b) Plaintiffs and all class members be awarded statutory damages;

(c) Plaintiffs and all class members be awarded treble damages;

(d) Plaintiffs and all class members be awarded costs and attorneys' fees;

(e) Defendants be disgorged of all ill-gotten gains associated with the Inbox Loan agreements;

(f) An order that Defendants and their agents, or anyone acting on their behalf, be enjoined from the unlawful conduct, including advertising, soliciting, and entering into any new loan contracts at usurious rates in North Carolina, collecting payments on existing usurious loan contracts in North Carolina, and reports of missed or late payments to reporting agencies on the loans, as well as from altering, deleting or destroying any documents or records that could be used to identify Class members;

(g) An order declaring that the Inbox Loan contracts in North Carolina violate North Carolina and federal law and are void and unenforceable;

(h) An order certifying Plaintiffs' claims and all other persons similarly situated as class action claims under Rule 23 of the North Carolina Rules of Civil Procedure, and appointment of the undersigned as class counsel; and

(i) Such other and further relief as the Court may deem just and proper.

This the 24th day of January 2019.

36

Case 1:19-cv-00327-TDS-JLW   Document 3   Filed 03/25/19   Page 36 of 37

Respectfully submitted,

W. Stacy Miller, II (NCSB 21198)
MILLER LAW GROUP, PLLC
555 Fayetteville St., Suite 201
Raleigh, NC 27601
T: 919-348-4361
F: 919-729-2953
E: stacy@millerlawgroupnc.com

Benjamin M. Sheridan (52734)
Klein & Sheridan, LC
3566 Teays Valley Road
Hurricane, WV 25526
T: 304-562-7111
F: 304-562-7115
E: bsheridan@kswvlaw.com

James L. Kauffman (pro hac vice)
1055 Thomas Jefferson Street, NW Suite 540
Washington, DC 20007
T: 202-463-2101
F: 202-463-2103
E: jkauffman@baileyglasser.com

*Counsel for Plaintiff and the Putative Class*

37